Filed 7/23/24  P. v. Oakley CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY WILLIAM OAKLEY,<br><br>      Defendant and Appellant. | A167068<br><br>(Mendocino County Super. Ct.<br>   No. SCUKCRCR2020359461) |

Defendant Anthony William Oakley sexually assaulted three of his former romantic partners, including his wife, and a jury convicted him of several felonies, including spousal rape by force (former Pen. Code,[1] §§ 262, subd. (a)(1), 264, subd. (a)), and forcible rape (§§ 261, subd. (a)(2), 264, subd. (a)).  The trial court sentenced him to a lengthy prison term.  Oakley appeals, advancing three claims of instructional error.  We affirm.

## BACKGROUND

### I.

The prosecution charged Oakley with 10 felonies.  At his first trial in 2021, a jury convicted him of false imprisonment but failed to reach a verdict on the remaining charges.

---

[1] Undesignated statutory references are to the Penal Code.

1

Following the verdict, the prosecution filed an amended information. As relevant here, the operative information charged Oakley with seven felonies: assault with the intent to commit rape (§ 220, subd. (a)(1); count 1), spousal rape by force (former § 262, subd. (a)(1), § 264, subd. (a); count 2), forcible rape (§§ 261, subd. (a)(2), 264, subd. (a); counts 3 & 4), criminal threats (§ 422; counts 5 & 6), and false imprisonment (§ 236; count 7). The information alleged enhancement allegations (§§ 667.61, subds. (b), (e)(4), 667.6, subd. (d)) and aggravating circumstances (Cal. Rules of Court, rule 4.421).

## II.

At Oakley's second trial, the parties offered the following evidence:[2]

### A. Amanda J. (count 1)

Amanda J. began dating Oakley while she was in high school. In 2011—when she turned 18—they began living together. They had a child together the following year. Oakley physically and emotionally abused Amanda during the relationship. On one occasion, after she refused Oakley's sexual advances, he told her to " 'shut the fuck up' " and held her down. She tried—unsuccessfully—to push him off of her; in response, he frustratedly poked his penis in between her legs. He gave up before he penetrated her vagina.

On another occasion, while Amanda was pregnant with their child, Oakley texted her that he would " 'kill the baby' " if she didn't return home immediately. Amanda called the police. When they arrived at Amanda and Oakley's house, Oakley admitted he sent Amanda the text message and stated he and Amanda " 'had both battered each other during their

---

[2] We provide an overview of the evidence here; in the discussion of Oakley's claims, we provide additional factual detail.

2

relationship.' "[3]  Another time, he threw a 12-pack of soda at her.  A can hit her in the head and exploded; in response, he told her to clean it up.

Amanda and Oakley broke up in April 2014.

**B. Jasmine O. (counts 2 & 5)**

Jasmine and Oakley began dating in 2013, while he was still dating Amanda.  Eventually, they moved in together.

The domestic violence began in 2015.  While they were shopping, Oakley punched Jasmine in the stomach so hard she "keeled over" and could not breathe.  Another time, he pulled her off their couch and dragged her across the floor.  Once—after Amanda refused to have sexual intercourse with him—Oakley took her phone and handcuffed her to their futon because she wanted to call her parents.  He told her that he would let her go when she was " 'ready to be nice.' "  More than an hour later, he finally released her and returned her phone, but he warned that if her parents arrived, he would hold her " 'hostage' " and " 'kill [her] in front of them.' "  Six months later, he pushed her into a wall.  In 2017, he slapped her face and her lip bled.  Oakley told Jasmine that he had hit, chased, and choked Amanda.

According to Jasmine, Oakley was "[v]ery obsessive" about sex:  he "felt he had a right to it."  He told Jasmine that when they got married, it would be her " 'job to pleasure [him].' "  Between 2016 and 2018, Jasmine was working double shifts; she would return home from work exhausted and go straight to bed.  Before she went to bed, however, Oakley warned her not to fall asleep because he would want to "have sex" later in the evening.  Jasmine told him they were not going to have sexual intercourse, and she asked him not to wake her.  On two occasions—once in 2016 and another in 2017—Jasmine awoke to him "penetrating" her with his penis.

---

[3]  Officers arrested him for threatening Amanda.

3

Jasmine and Oakley married in May 2018. One morning a few months later, he asked to have sexual intercourse, but she declined. While she cried and said no, he pinned her down and penetrated her. Afterward, Oakley asked why she was crying. When she answered, " '[b]ecause you just raped me,' " he got "an evil smirk" on his face. He said, " 'I didn't realize you didn't want it.' "

In January 2019, Jasmine moved out of Oakley's home. Thereafter, he contacted her daily, trying to convince her to come back to him. On one occasion, "in the middle of the night" in January, he sent her a Facebook message demanding that she come home and threatening that if he discovered she was with another man he'd " 'go crazy. Like Andrew. Only worse.' "[4] The threat scared her because Oakley had previously threatened to kill her and she was "not really sure what would be worse than what happened" to her best friend.

Jasmine obtained a restraining order. When she and her new boyfriend picked up her things from Oakley's home, he and his father ambushed the man, repeatedly punching and kicking him.

**C. Brianna G. (counts 3, 4, 6 & 7)**

Brianna G. moved into Oakley's home in February 2019, just a month after Jasmine moved out. During the relationship, Oakley punched her in the face and stomach, grabbed her, and pushed her. On one occasion, he threatened to make her suffer while her daughter watched.

Oakley forced Brianna to have sexual intercourse "at least 30 times" including on March 25 and April 16, 2019. On March 25, he began kissing Brianna with the expectation that she would have sex with him. She told

---

[4] In 2018, Andrew Crowingshield—Oakley's best friend—shot and killed Jasmine's best friend.

4

him no and rolled away from him. Oakley ignored her refusal; he overpowered and penetrated her. The next morning, he wanted to have sexual intercourse, but she again refused. He prevented her from leaving the bedroom and tried to make her orally copulate him. After more refusals, he punched her in the face and shoved her into the footboard, splitting open her chin. On April 16, Oakley touched her in a sexual manner while she tried to sleep. She "clearly" told him no before he grabbed her, held her so she "couldn't move," and penetrated her. He persisted even after she told him to stop because it was hurting her. The following day, she accused him of "force-fuck[ing]" her; he responded: " 'I was trying to get you to love me' " and apologized.

Brianna ended the relationship in May or June 2019. In a pretext call, she asked Oakley, "Do you understand that it's rape? Do you understand now that you raped me?" He responded, "Yes, I do."

### D. Defense Testimony

Oakley admitted he hit Amanda during arguments, but only in retaliation for her hitting him. He acknowledged sending a text message to her threatening to kill their unborn baby and throwing a soda can "at the wall." He denied trying to rape Amanda.

Oakley denied raping Jasmine or penetrating her while she slept. Although he did text her that he would "go crazy like Andrew," he did not intend the text to be threatening. He also conceded he made "moves on her to wake her up so [they] could have sex in the middle of the night."

Oakley characterized Brianna's allegation that he raped her 30 times as "crazy" and "delusional." He denied raping her. But as to count 4—forcible rape—he admitted he may have been "a little too persuasive." He also admitted that he had acknowledged raping Brianna during the pretext

5

call and that he had not denied "force-fuck[ing]" her in a text message.  He explained that he apologized for things he had not done, just "to help her feel better."

### E.  Verdict and Sentence

In November 2022, the jury found Oakley guilty of the charges and found true the multiple-victim allegation.  He waived a jury trial on the aggravating circumstances and the trial court found several allegations true. (Cal. Rules of Court, rule 4.421(a)(1), (3) & (b)(1).)  In 2023, the court sentenced Oakley to 53 years to life in prison.

## DISCUSSION

Oakley advances three claims of instructional error.  We address these arguments notwithstanding his failure to raise them in the trial court.  (See *People v. Lewelling* (2017) 16 Cal.App.5th 276, 294.)  We review claims of instructional error de novo, and the instructions as a whole rather than each instruction in isolation.  (*People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Nelson* (2016) 1 Cal.5th 513, 544.)  If the claim is that an instruction is ambiguous, " ' "the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction." ' " (*Nelson*, at p. 544.)

## I.

### *Corpus Delicti*

Oakley first argues the trial court impermissibly lowered the prosecution's burden of proof by omitting one sentence from the pattern instruction on corpus delicti (CALCRIM No. 359).  We disagree.

### A.  Additional Background

CALCRIM No. 359 provides:  "The defendant may not be convicted of any crime based on (his/her) out-of-court statement[s] alone.  You may rely on the defendant's out-of-court statements to convict (him/her) only if you first

6

conclude that other evidence shows that the charged crime [or a lesser included offense] was committed. [¶] That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed. [¶] This requirement of other evidence does not apply to proving the identity of the person who committed the crime [and the degree of the crime]. If other evidence shows that the charged crime [or a lesser included offense] was committed, the identity of the person who committed it [and the degree of the crime] may be proved by the defendant's statement[s] alone. [¶] You may not convict the defendant unless the People have proved (his/her) guilt beyond a reasonable doubt."

The trial court gave only the first two paragraphs of CALCRIM No. 359.[5]

### B. No Error in Omitting the Last Sentence of the Corpus Delicti Instruction

" 'In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause. . . . [T]he prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant'; 'some independent proof of the corpus delicti' is required." (*People v. Ramirez Ruiz* (2020) 56 Cal.App.5th 809, 829.) The quantity of the necessary independent evidence, however, is " 'not great. The independent evidence may be circumstantial, and need only be a "a slight or prima facie showing" permitting an inference of injury, loss, or harm from a criminal agency, after which the defendant's statements may be considered to strengthen the case on all issues.' " (*People v. Ledesma*

---

[5] Oakley does not challenge the trial court's omission of the third paragraph of the instruction concerning proof of identity.

(2006) 39 Cal.4th 641, 721.) "The corpus delicti rule is a rule of law that governs the admissibility of evidence. [Citations.] It has no bearing on the prosecution's burden to prove beyond a reasonable doubt all elements of the offense." (*People v. Diaz* (1992) 3 Cal.4th 495, 529.)

The trial court did not err by omitting the final sentence of CALCRIM No. 359. The first two paragraphs of the instruction "correctly express" the law. (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1428.) The last sentence of the instruction reminds the jury that it may not convict the defendant unless the prosecution has proven guilt beyond a reasonable doubt. While this sentence was omitted from the instruction, the jury was provided with this information. The court instructed the jury with CALCRIM No. 220, which provides in relevant part: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. . . . [¶] . . . [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. . . . [¶] . . . . Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty." And during closing argument, the prosecutor and defense counsel repeatedly emphasized the prosecutor's burden of proof.

Because CALCRIM No. 220 defined the prosecution's burden of proof, the trial court's failure to include the final sentence of CALCRIM No. 359 was not erroneous. A "judge need not include a legally correct jury instruction when it is duplicative of other instructions provided to the jury." (*People v. San Nicolas* (2004) 34 Cal.4th 614, 675.) Moreover—and reviewing the instructions as a whole—we find no merit to Oakley's suggestion that the omission could have led the jury to believe it could convict him as long as the "evidence merely supported a 'reasonable inference' of guilt." (Capitalization

8

& boldface omitted.)  (See *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220 [courts presume the jury understands and correlates its instructions].) We are similarly unpersuaded by Oakley's contention that the omission of the final sentence actually lowered the prosecution's burden of proof.  (See *People v. Gamache* (2010) 48 Cal.4th 347, 376 [rejecting argument that CALJIC No. 2.15, which contains similar language and pertains to possession of stolen property, lowered prosecution's burden of proof].)  As stated *ante*, the corpus delicti rule has "no bearing on the prosecution's burden to prove beyond a reasonable doubt all elements of the offense."  (*People v. Diaz, supra*, 3 Cal.4th at p. 529.)

## II.

### *The Unanimity Instruction*

Oakley next argues the trial court erred by "wording the unanimity instruction" as applying only to count 2, the spousal rape by force of Jasmine. (Capitalization & boldface omitted.)  According to Oakley, the instruction implied that unanimity was not necessary to convict him of raping Brianna (counts 3 & 4) and threatening Jasmine (count 5).  He is mistaken.

In a criminal case, "the jury must agree unanimously the defendant is guilty of a specific crime."  (*People v. Russo* (2001) 25 Cal.4th 1124, 1132, italics omitted.)  Therefore, "when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act."  (*Ibid.*)

The trial court gave a unanimity instruction (CALCRIM No. 3500) as to count 2, spousal rape by force of Jasmine.  It did not, however, give a unanimity instruction with respect to any other charge.  No such instruction was required.  As to counts 3 and 4, the prosecutor clearly specified in the charging document—and in opening and closing arguments—that it was

9

pursuing convictions for raping Brianna on March 25 and April 16, 2019. (*People v. Diaz* (1987) 195 Cal.App.3d 1375, 1382 [unanimity instruction properly omitted where prosecutor tied specific count to specific act during argument].) When instructing the jury, the court specified the prosecutor had to prove Oakley raped Brianna on March 25 and April 16, 2019. As to count 5, the prosecutor specified during opening and closing argument the charge pertained to Oakley's threat to "go crazy like Andrew." Under the circumstances, the court did not err by failing to instruct the jury on unanimity as to counts 3, 4, and 5.

## III.

### *Uncharged Sex Crimes Instruction*

Oakley asserts the trial court erred by not defining the term "sexual assault" when it gave CALCRIM No. 1191A—the pattern jury instruction on using evidence of uncharged sex crimes to prove propensity. He contends that without a definition, "the jury was simply left to speculate what those crimes might consist of," and the error requires reversal of counts 1 through 4. We are not persuaded.

#### A. Additional Background

The prosecution elicited testimony on uncharged sex offenses pursuant to Evidence Code section 1108, subdivision (a), which provides that evidence of uncharged sexual offenses may be admissible to show propensity when a defendant is accused of a sexual offense.

In giving CALCRIM No. 1191A, the trial court stated the prosecution "presented evidence that the defendant committed other crimes of sexual assault that were not charged in this case" and that "[t]he crimes of sexual assault are defined for you in these instructions." It continued: "If you decide that the defendant committed the uncharged offenses, you may but are not

10

required to conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and, based on that decision, also conclude that the defendant was likely to commit assault, rape, forcible rape, and rape of spouse, as charged here." The court defined the following crimes: inflicting injury on a cohabitant; false imprisonment; assault with intent to commit rape; spousal rape by force; rape by force; making criminal threats; battery; assault; and attempted rape.

## B. Any Assumed Error in Failing to Define the Term "Sexual Assault" Was Harmless

Assuming for the sake of argument the trial court erred by failing to define the term "sexual assault" when instructing the jury with CALCRIM No. 1191A, the error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836, or *Chapman v. California* (1967) 386 U.S. 18, 24 because overwhelming evidence supported the convictions. (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 502–503.) All three victims testified—describing the offenses in detail—and Oakley admitted raping Brianna during a pretext call and in text messages. (*People v. Gammage* (1992) 2 Cal.4th 693, 700 [uncorroborated testimony of victim sufficient to sustain conviction for sex crime].) On this record, we are convinced beyond a reasonable doubt the jury would have reached the same verdict had the term "sexual assault" been defined in the manner Oakley suggests.[6]

### DISPOSITION

The judgment is affirmed.

---

[6] We reject Oakley's cumulative prejudice claim. (*People v. Duff* (2014) 58 Cal.4th 527, 562 [no cumulative error where nothing to cumulate]; *People v. Vieira* (2005) 35 Cal.4th 264, 305 [no cumulative error where only one harmless error].)

_____

STEWART, P.J.



We concur.



_____

RICHMAN, J.



_____

DESAUTELS, J.



*People v. Oakley* (A167068)


12